IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 28, 2022

## MICHAEL LEWIS FREEMAN v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 117949   Steven Wayne Sword, Judge**

_____

### No. E2021-01039-CCA-R3-PC

_____

Petitioner, Michael Lewis Freeman, appeals the denial of his post-conviction petition. Specifically, Petitioner alleges that trial counsel was ineffective for failing to advise him to testify at trial in support of his claim of self-defense. Following our review of the entire record and the briefs of the parties, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and JOHN W. CAMPBELL, SR., JJ., joined.

J. Liddell Kirk, Madisonville, Tennessee, for the appellant, Michael Lewis Freeman.

Herbert H. Slatery III, Attorney General and Reporter; Kayleigh Butterfield, Assistant Attorney General; Charme P. Allen, District Attorney General; and Leslie Nassios and Hector Sanchez, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

Petitioner was charged with one count of felony murder for the fatal stabbing of the victim in the course of an apparent theft on January 22, 2014. Following a jury trial, Petitioner was convicted of the lesser included offense of second-degree murder and was sentenced to twenty-one years to serve in the Tennessee Department of Correction. On appeal, this court affirmed the judgment, holding that the evidence was sufficient to support Petitioner's conviction, that the trial court did not err in overruling Petitioner's motion to suppress his statements to police, and that the trial court did not err in allowing the jury to consider a flight instruction. *State of Tennessee v. Michael Freeman,* No. E2018-00778-CCA-R3-CD, 2019 WL 2244759, at *1 (Tenn. Crim. App. May 24, 2019) *perm. app.*

*denied* (Sept. 18, 2019). Petitioner filed an application for permission to appeal to the Tennessee Supreme Court which was denied.

*Trial*

This court's opinion on direct appeal summarized the facts at trial as follows:

> On April 15, 2014, a Knox County grand jury charged the [Petitioner] with first degree felony murder. *See* Tenn. Code Ann. § 39-13-202. Prior to trial, the [Petitioner] filed a motion to suppress his recorded statement given at the police department. In it, he argued that he "explicitly invoked his rights to the assistance of counsel to three separate law enforcement officers" and that these requests were not "scrupulously" honored. A hearing was held on the motion. The trial court thereafter entered a written order denying the motion, concluding that the [Petitioner] "never made an unequivocal invocation of his rights" and that he "made a voluntary and knowing waiver of all of his Miranda rights." In its order, the trial court examined, in detail, each instance when the [Petitioner] made any reference to an attorney. After the denial of his motion to suppress, the [Petitioner] proceeded to a jury trial, where the following evidence was presented.
>
> Around 1:00 a.m. on January 22, 2014, the [Petitioner] called 911 to report "a crime" and requested that he be picked up by an officer. Initially, the [Petitioner] would not provide any more details. The [Petitioner] eventually told the operator that he stabbed a friend who was attacking him, that it was "self-defense," that he did not know if the other person was alive or not, and that he left the scene because he was afraid the person would get a gun and retaliate. The [Petitioner] provided his name, his general description, and his location, and he advised that he would be waiting for an officer to arrive to take him to the victim's location.
>
> Knoxville Police Department ("KPD") Officer James Lockmiller testified that he arrived at the [Petitioner]'s residence on South Dewey Road. The officers knocked on the front door, and the [Petitioner] "started to come outside." According to Officer Lockmiller, the [Petitioner] came out of the residence with an object in his hand. The [Petitioner] was ordered to drop the object, and he complied. The object was a pocketknife that was wrapped in a

- 2 -

toboggan, and the victim's blood was found on the knife. Officer Lockmiller testified that the [Petitioner] appeared to "have an injury"; the [Petitioner] had a cut on his hand that required bandaging.

The [Petitioner] "said that he was involved in a stabbing incident because he had been attacked." The [Petitioner] was unsure of the victim's address but agreed to show them the location. The [Petitioner] was placed in a police cruiser and provided "turn-by-turn" directions to the victim's residence, which was "[r]oughly three blocks" away.

KPD Officer John Martin testified that, when he entered the victim's residence, he first observed "the victim lying on the floor just inside the doorway." Also, Officer Martin observed a large amount of blood "directly around the victim" and noted that "[i]t appeared to have dried" already in some places. Officer Martin performed a "protective sweep" of the victim's residence, opining that "it was a very well kept residence." According to Officer Martin, he did not "see any sort of disorder or a sign of a struggle anywhere else" inside the home. There were also four vehicles parked outside, and car keys were found near the victim.

The [Petitioner] was transported to the KPD. While waiting to speak with the lead investigator, Amy Jinks, the [Petitioner] explained to Investigator Brian Moran that, before he stabbed the victim with the victim's pocketknife, the victim had struck him in the mouth and kept threatening to kill him. The [Petitioner] showed Investigator Moran his lip. The [Petitioner] claimed that the victim had "flipped" and that he acted in self-defense. When Investigator Jinks arrived at the police station, she spoke with the [Petitioner] after giving him Miranda warnings. The [Petitioner] told Investigator Jinks that he had known the [Petitioner] for about three or four years and that they spent time together often. The [Petitioner] relayed that the victim would sometimes drink too much and become insulting.

The [Petitioner] told Investigator Jinks that he had visited the victim three times that day and that, earlier in the day, they drank vodka and watched television together. The [Petitioner] claimed that he had asked the victim to hold $600 in cash for him. According to the [Petitioner], when he returned later in the evening, the victim was

still drunk and began threatening him. In addition, the [Petitioner] said that he knew the victim had a gun and brass knuckles inside the house. The [Petitioner] claimed that the victim punched him in the mouth, so he picked up a "little bitty" pocketknife that was on the table in the den. The [Petitioner] ultimately admitted that he stabbed the victim and took cash from the victim's pocket. He acknowledged that the victim did not have any weapons on his person at the time of the stabbing. The [Petitioner] described that "he shoved [the victim] down and he stabbed him in the back of the neck, and he held him until he quit moving." The [Petitioner] said that he left the residence with the knife wrapped in a toboggan and drove a few blocks to his residence before calling the police.

KPD crime scene technician Stephanie Housewright testified that she examined the victim's residence immediately following the victim's death. While she did not observe any brass knuckles inside the victim's home, she admitted that she did not look underneath the recliner. Ms. Housewright testified that she found an empty liquor bottle and a change purse containing several crack cocaine rocks next to the victim's recliner in the den. Ms. Housewright also noted that she saw boxed home security systems and some tire rims inside the home. She photographed the residence, agreeing that an object shown to her in one of the photographs of an upstairs bedroom "[p]otentially" looked like a firearm.

In addition, after the [Petitioner] arrived at the police station, Ms. Housewright photographed "clean, crisp 20-dollar bills" that were taken off the [Petitioner]'s person. The [Petitioner] was also photographed, and those photos were shown to the jury. The victim's blood was also discovered on the [Petitioner]'s clothing.

The victim's cellphone was examined. It was determined that an incoming call was made and answered at 11:12 p.m. on January 21, 2014.

Dr. Darinka Mileusnic-Polchan, the Chief Medical Examiner for Knox County, performed the autopsy of the victim, determining that the cause of death was "multiple stab wounds," five at least, and that the manner of death was homicide. The first wound she documented was a "complex stab wound on the chin" that went through the lower lip and "into the oral cavity or inside the mouth." She opined that it

was possible that this was two separate stab wounds due to the complexity of the wound, but she could not say for certain. The second wound was on the right lower neck, where the knife penetrated the victim's thyroid gland. The third wound was a superficial cut. The fourth wound entered the left side of the neck, went through the victim's thyroid gland, penetrated his larynx, and cut his main carotid artery. According to Dr. Mileusnic-Polchan, the victim "would bleed quite profusely" from this wound, which she categorized as a "deadly wound." The fifth wound was a stab wound to the "nuchal region" at the back of the victim's head, where the blade went between the first and second vertebrae and penetrated the victim's cervical spinal cord, which "would cause partial paralysis of the extremities." Dr. Mileusnic-Polchan observed that this stab wound was downward, whereas the other four to the victim's front side were inflicted in an upward manner.

The victim's blood alcohol level was determined to be .32 percent at the time of his death. Moreover, the victim tested positive for cocaine metabolites, Valium, and a "veterinary drug . . . used to deworm cows." Dr. Mileusnic-Polchan believed that the victim had used "cocaine sometime within a couple hours of death[.]"

Dr. Mileusnic-Polchan reviewed the photographs of the crime scene and the information provided by one of her field investigators. Her investigator described the victim's body "as being still warm and flaccid[,] meaning that rigidity [had] not set in and that lividity was not prominent yet." Dr. Mileusnic-Polchan was able to observe from her review of the photographs that "the blood was drying . . . on the exposed surfaces that were not under the body," that "it was already dry on the . . . coffee table[,]" and that "it had penetrated and . . . diffused through the carpet." She maintained that, "on [the victim's] clothing items, the blood was starting actually to separate into kind of [a] serum in the blood clot" and that it had "already diffused all over the rest of the shirt and then remained in that position even the next day[.]" She stated that, "obviously, some time ha[d] to pass for all of those processes to take place." Moreover, she opined that "several hours" had passed between the victim's death and when his body was discovered and photographed, but she could not provide a precise determination of the time of death.

Dr. Mileusnic-Polchan assented that the victim's wounds were consistent with his being involved "in a struggle[.]" She could not determine, "to a reasonable degree of medical certainty[,]" the sequence in which the victim's wounds were inflicted. Dr. Mileusnic-Polchan was able to opine that the victim was "low down on the floor" when he was stabbed in the neck. She further stated the nature of the victim's wound to the back of the head was consistent with the [Petitioner]'s being behind the victim or "above him if he's already down" and stabbing him. Moreover, the "jagged nature of some [the victim's] wounds in the facial and neck area" were also "consistent with . . . movement[.]"

The victim's daughter, Cashauna Lattimore, testified that her father lived alone, received monthly social security disability, and participated in "the numbers" or "illegal number bracket." According to Ms. Lattimore, her father frequently carried cash on his person and hid cash "throughout the residence[.]" Ms. Lattimore confirmed that her father was a daily drinker, but she claimed that "[h]e was always able to function . . . [e]xcept for when he drank something that was not his regular brand of vodka." She additionally acknowledged that her father had used cocaine in the past. Ms. Lattimore had no knowledge of her father's possessing any guns or brass knuckles immediately before his death, but he did have "several pocketknives on the side table in his den." According to Ms. Lattimore, her father no longer carried a gun because "he had gotten in trouble . . . with a weapons charge several years" prior, so "he got rid of that gun[.]" She claimed that she had not seen him with a gun since 2014.

Ms. Lattimore testified that she had known the [Petitioner] for "maybe two or three" years prior to her father's death, that she was aware the [Petitioner] and her father were friends, and that she had would often see the [Petitioner] at her father's house when "their friendship was strong." However, at some point, the [Petitioner]'s and her father's friendship had "weakened" due to a disagreement, and the [Petitioner] did not visit. According to Ms. Lattimore, the [Petitioner] had begun "coming back" around to her father's house "closer in time to [her] father's death[.]"

Ms. Lattimore stated that she visited her father's home the day after his death. While there, she did not find the cash her father kept inside

a pillowcase or any brass knuckles. Ms. Lattimore reported that a burglary occurred at the residence several days later. Ms. Lattimore also admitted that there were several females who were "out stealing things and bringing [them to her father] for him to fence." She was aware that this happened "on a regular basis[.]"

The victim's cousin, Avery Maurice Jack, testified that the victim "played the numbers every day[.]" Mr. Jack identified two calendars on the wall above the victim's desk that showed several sequences of numbers on specific days. The last entry was January 21, 2014. Mr. Jack also testified that the victim kept cash hidden around his house and that the victim did not have a gun or brass knuckles.

Michael Shadden, another cousin of the victim's, also testified. Mr. Shadden identified the rims in the victim's home and testified that he sold those to the victim "because they wouldn't fit on [his] car." Mr. Shadden further stated that the victim "never carried a gun" and that he had never seen brass knuckles in the house.

Tessa Freeman, the [Petitioner]'s sister, testified that she saw the [Petitioner] in the driveway of the home they shared that evening between 10:00 and 10:30 p.m. However, when she left again around 11:30 or 11:45 p.m., the [Petitioner] was gone. According to Ms. Freeman, he was still not home when she returned about thirty minutes later.

Angela McAfee was one of the women who routinely supplied the victim with stolen goods. Ms. McAfee spoke with the victim in the "daytime" on January 21, 2014, the day of his death, because she "needed money." After this conversation, she and a friend, Savanna Holloway, went to steal some candy, toboggans, and batteries. According to Ms. McAfee, when they arrived at the victim's house, it was during the day, and they had a conversation with him in the dining room. The [Petitioner] was present. Ms. McAfee said that the victim offered the [Petitioner] some of the stolen items, but he refused them. Ms. McAfee testified that, during this conversation, the [Petitioner] "pulled out a little bitty . . . pocketknife and stood by" the victim. The victim instructed the [Petitioner] to put the knife away. Ms. McAfee stated that everyone was being "friendly" and laughing.

Ms. Holloway also testified. She recalled that this visit to the victim's house occurred around 10:00 or 11:00 p.m. Ms. Holloway testified that, during this conversation, the [Petitioner] was "very agitated" and "was pacing back and forth" with a "knife in his hand[.]" While the [Petitioner] made Ms. Holloway "nervous," he was not threatening anyone.

The [Petitioner] called Kelly Johnson, records custodian and fraud specialist at ORNL Federal Credit Union, who provided information on a checking account belonging to the [Petitioner]'s wife, Heather Lange. According to Ms. Johnson, on January 21, 2014, there was an ATM withdrawal of $600 at 2:29 p.m. from the account, and an additional withdrawal from another ATM at 4:29 p.m. in the amount of $163.

The [Petitioner]'s wife then testified. Ms. Lange stated that only she and her husband had access to the debit card and PIN number for her account. She denied that she made any withdrawals from the account on January 21, 2014, claiming that she "was home all day." She did not recall why her husband made these withdrawals that day. However, she did recall the [Petitioner]'s returning home that evening "terrified," holding a knife in his hand, and saying that the victim "was gonna kill" him.

Following the conclusion of the proof, the jury found the [Petitioner] guilty of the lesser-included offense of second degree murder. See Tenn. Code Ann. § 39-13-210. The trial court sentenced the [Petitioner] to twenty-one years' imprisonment. The [Petitioner] timely appealed.

Id. at *1-5. Petitioner filed his timely pro se post-conviction petition on September 10, 2020, and requested appointment of counsel. Post-conviction counsel subsequently filed an amended petition alleging that trial counsel was ineffective for failing to advise Petitioner to testify in support of his claim of self-defense.

*Post-Conviction Hearing*

Trial counsel testified that she was appointed to represent Petitioner in proceedings following general sessions court, sometime in 2016. Thereafter, trial counsel represented Petitioner throughout the course of trial and in his direct appeal. Trial counsel testified that

in her representation of Petitioner, she received discovery from the State, and she met with Petitioner to go over the evidence "numerous" times prior to trial. Trial counsel developed a trial strategy based on self-defense, because "there was no dispute that [Petitioner] was the one who stabbed [the victim.]" Petitioner made multiple statements indicating that he acted in self-defense. Trial counsel testified that she and Petitioner "spent a great deal" of time trying to attack the State's theory that the crime was felony murder in the course of theft.

In preparation for trial, trial counsel and Petitioner practiced potential direct and cross-examination questions "multiple times," but "[Petitioner] was not very good at testifying," he could not "control his temper," and he "could not answer the critical questions as to why he just didn't leave. He could not answer the critical questions of why so many injuries were inflicted upon [the victim]." Accordingly, trial counsel advised Petitioner not to testify; however, trial counsel testified that Petitioner "was certainly advised" that he had a right to testify and ultimately it would be his choice. She also explained to him that without his testimony at trial, evidence of self-defense would be presented to the jury through Petitioner's statements to police and his interviews with detectives. Following a *Momon* hearing, Petitioner elected not to testify.

Petitioner testified that in preparation for trial, he and trial counsel "went over some facts from [his] case," but that he did not recall reviewing his out-of-court statements with trial counsel, nor discussing the trial strategy. Petitioner testified that he discussed his desire to testify at trial with trial counsel and that she had advised him not to testify because she thought he would lose his temper. Petitioner testified that trial counsel did not advise him of the disadvantages of his decision not to testify and that he and trial counsel did not practice direct and cross-examination questions. Petitioner recalled trial counsel explaining to him that ultimately it would be his choice whether he testified or not, but that his decision not to testify at trial was based "exclusively" on trial counsel's advice. Petitioner was aware that there would be evidence introduced at trial, outside of Petitioner's testimony, to support his claim of self-defense. Petitioner testified that he had been friends with the victim for a couple of years and that he had not seen the victim in possession of weapons until the day of the murder. Petitioner testified that he did not owe the victim any money and that he had been at the victim's house earlier in the day on January 21, 2014, just to visit with the victim. He saw the victim in possession of a firearm and brass knuckles on that day.

Petitioner testified that when he returned to the victim's house on the evening of January 21, 2014, the victim was drunk and angry, claimed that Petitioner owed him money, and stated that he would kill Petitioner if he did not give him the money he owed him. According to Petitioner, the victim started the argument and punched Petitioner in the head and face. During the argument, Petitioner did not see the firearm or brass knuckles

at that time.  Petitioner considered leaving, and told the victim that he needed to leave, but the victim told him "you'll be lucky if I let you leave here with [that money.]"  Instead of leaving, Petitioner stayed and attempted to calm the victim.  Petitioner testified that the pocketknife that he used to stab the victim was not in his possession when the argument began; he grabbed the pocketknife off of a table in the victim's "TV room" during the argument.  Petitioner testified that he was aware of witnesses' statements claiming he had a pocket knife earlier in the day, but those statements were inaccurate because he had never owned a pocketknife.  Petitioner testified that he decided to grab the pocketknife because the victim was "charging" him and "yelling and screaming and threatening to kill me. . . ."  Based on Petitioner's recollection, he and the victim were similar in size and both had been drinking on the day of the murder, so both were impaired during the argument.  Petitioner testified that he continued to stab the victim until the victim stopped moving because after the first stab, the victim continued to punch Petitioner.  Once the victim "stopped fighting," Petitioner left the victim's house to go home where he called the police.  Petitioner testified that he knew that the victim was injured when he left, but he did not know if the victim was alive or deceased.  Petitioner gave the pocketknife to police and gave a statement, but the statement was not "all that accurate" because he had been drinking on the day of the murder.  Petitioner testified that had he testified at trial, his testimony would have "generally" been what he testified at the post-conviction hearing.

On cross-examination, Petitioner acknowledged that he heard the evidence that was presented at trial, and he could not identify what information from his proposed testimony was not presented by other evidence at trial.  Petitioner also acknowledged that he had given the victim $600 for safekeeping earlier on the day of the murder, but later in the evening the victim only returned $500 to Petitioner.  Petitioner agreed that trial counsel had met with him "many times" in advance of trial, that she had a mental evaluation completed on Petitioner, and that she "beat" the original charge of felony murder that was brought against Petitioner.

The post-conviction court concluded that Petitioner had failed to prove either deficiency or prejudice and accordingly, denied Petitioner's petition for post-conviction relief.  The post-conviction court's written order denying relief was filed on August 6, 2021.  This timely appeal followed.

**Analysis**

Petitioner contends that trial counsel was ineffective for failing to advise him to elect to testify at trial in support of his claim of self-defense.  Petitioner relies on his own testimony at the post-conviction hearing, alleging that even though self-defense was established through other evidence at trial, his claim to self-defense would have been stronger had he testified.  The State argues that Petitioner failed to show either deficiency

or prejudice and that accordingly, he has failed to prove his claim of ineffective assistance of counsel. We agree with the State.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. When a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). Failure to satisfy either prong results in the denial of relief. *Strickland*, 466 U.S. at 697. Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f); *see Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). The factual findings of the post-conviction court are binding on an appellate court unless the evidence in the record preponderates against those findings. *Dellinger*, 279 S.W.3d at 294. The post-conviction court's application of law to its factual findings is reviewed de novo with no presumption of correctness. *Calvert*, 342 S.W.3d at 485. A claim of ineffective assistance of counsel presents a mixed question of law and fact that is subject to de novo review with no presumption of correctness. *Id.*; *Dellinger*, 279 S.W.3d at 294; *Pylant v. State*, 263 S.W.3d 854, 867 (Tenn. 2008).

Review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006). Deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. *Cooper v. State,* 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome" of the trial. *Id.* The stronger the proof of guilt

presented at trial, the more difficult it is to prove the prejudice prong of *Strickland*. When proof of guilt is overwhelming, proving prejudice is exceedingly difficult. *See Proctor v. State*, 868 S.W.2d 669, 673 (Tenn. Crim. App. 1992); *Randy Bray v. State*, No. M2011-00665-CCA-R3-PC, 2012 WL 1895948, at *6 (Tenn. Crim. App. May 23, 2012) (finding that, in light of overwhelming evidence, petitioner could not demonstrate prejudice); *Raymond E. McNeil v. State*, No. M2010-00671-CCA-R3-PC, 2011 WL 704452, at *6 (Tenn. Crim. App. Mar. 1, 2011) (finding that overwhelming evidence of guilt precluded showing of prejudice from admission of item of evidence at trial).

In this case, the post-conviction court made the following findings concerning Petitioner's claim that trial counsel was ineffective for failing to advise him to elect to testify at trial:

> The court finds that the Petitioner has failed to show by clear and convincing evidence that his counsel was deficient in her performance concerning her advice on testifying at trial. The advice concerning testifying was based upon reasonable grounds after a thorough investigation of the case and development of sound trial strategy.
>
> [Trial counsel] prepared diligently for trial including practice testimony by the Petitioner. Her concerns about the Petitioner's ability to testify in a beneficial manner at trial were borne out by the Petitioner's confusing testimony during the post-conviction hearing. The petitioner was able to get his claim of self-defense before the jury through his statement to the police. He offered no additional information during the post-conviction hearing that would have made a difference at trial. The court finds that the Petitioner was fortunate to receive a second degree murder conviction rather than first-degree. Had he testified, there is a greater chance that he would be serving a life sentence rather than the jury acquitting him on self-defense.
>
> . . .
>
> Furthermore, the Petitioner has failed to present any evidence as to how his testimony, if given at trial, would have resulted in a different outcome. Therefore, he has failed to establish prejudice, assuming that trial counsel was deficient.

The record does not preponderate against the post-conviction court's findings concerning Petitioner's raised issue. *See Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). With its findings, the post-conviction court accredited trial counsel's testimony concerning Petitioner's defense. Trial counsel testified that although she advised Petitioner not to testify, because she did not believe that he could manage his temper, she explained to him that it was his decision. Petitioner testified that he chose to rely on trial counsel's advice in making his decision not to testify. Given that Petitioner's claim of self-defense was presented through his statements to police at trial, and Petitioner was ultimately convicted of an offense less severe than the offense with which he was initially charged, Petitioner failed to show how his testimony would have affected the outcome of his trial. The record supports a finding that trial counsel's advice was reasonable. Further, Petitioner testified at the post-conviction hearing that he stabbed the victim "until he stopped moving" and left without knowing the victim's condition. Had Petitioner offered this damaging testimony at trial, the evidence of his guilt would have been overwhelming. In light of overwhelming evidence, there can be no prejudice. *See Proctor*, 868 S.W.2d at 673. Therefore, Petitioner has not proven deficiency by clear and convincing evidence, nor has he shown that he was prejudiced in any way by trial counsel's advice that he not testify at trial. *Strickland,* 466 U.S. at 694. Petitioner is not entitled to relief.

## Conclusion

For the foregoing reasons, the judgement of the post-conviction court is affirmed.

_____
JILL BARTEE AYERS, JUDGE

- 13 -